Wright, J.,
delivered the opinion of the Court.
*260 We are of opinion, that upon the frame of the bill, and amended bills in this case, Benjamin E. Bridge-nor, in his individual right, as a citizen and inhabitant of Bledsoe County, as well as the said County, in its corporate capacity, must be regarded as having a proper status, as complainants, before this Court. It is true, that — from anything that appears in this record — the said Bridgenor does not reside within the tenth civil district of Bledsoe county, nor is he a tax-payer therein, and that in the case heretofore before this Court, where a private individual, has intervened to slay the organization of a new county, upon the ground that it violated some provision in the Constitution, he lived within the territory of that part of the old county sought to be detached, and was subject to taxes in the same.
But, we do not see why any citizen and inhabitant of the county, if he be a tax-payer, "is not so aggrievd by the unconstitutional proceedings — as that he may apply,. if he do so at a proper time — for a remedy. The spoliation of his county, must, of necessity, result in an increase of -taxation for public buildings and public expenditures, to his injury and wrong. We, therefore, think that the said Bridgenor, being a citizen of the county of Bledsoe, and a tax-payer therein — upon the recovering in some of the former decisions of the Courts— had such an interest in the question — if he had come in time — as that he might maintain a suit; 2 Hum., 483; 9 do., 159. The original bill was in his name, alone; but the amended bills are filed in his name, for himself, as well as on behalf of the Justices of the County of Bledsoe. This makes the county a com *261 plainant, in its corporate character, the justices being its proper representatives: Maury County vs. Lewis County, 1 Swan, 236. The objection, that the names of the justices are used' without their assent, or authority, situated, as this case appears to us, has nothing in it, because, though the authority is called in question in the answer, the want of it is not shown anywhere in the proof, and if it were, the question could not be raised in an answer, but was matter in abatement, or a thing to be taken advantage of by a rule upon the complainant, Bridgenor, or his attorney, to show by what authority the suit was being prosecuted in the names of the justices: 1 Swan, 239. It would not do to allow such a defense, after the case had been proceeded in to a trial upon its merits.
But the question still remains, whether the County of Sequatchie, before the complainant, Bridgenor, filed his bill — which was on the 18th of February, 1858-9— had been so organized, under the Statute creating it, as to become a political corporation of the State. If so, according to the case of Ford vs. Forwer et als., 9 Hum., 152, he, as an individual citizen, had no right to ask a Court of Equity to inquire into the validity of the Act, or to abolish the county; and such, we think, was the case here. On the 25th of February, 1856, the Legislature of Tennessee passed an Act, detaching from the county of Bledsoe the tenth civil district, and from the county of Marion the first and second civil districts, and attaching the same to the county ’of Hamilton; the Act to take effect on the 21st of September, 1857. On the 9th of December, 1857, the Legislature passed another Act, creating the county of Sequatchie, constituted of *262 the three civil districts aforesaid, by detaching ’ the same from the county of Hamilton; and which Act took effect immediately at its passage. This Act created the county of Sequatchie, in -, by metes and bounds, with all the powers and privileges, and subject to all the restrictions of other counties in the State — gave it Circuit and County Courts, and fixed the time and place of holding them — provided that all affairs, civil and military, within the fractions of which said county was composed, should continue to hold their office, and exercise all the powers thereof, and have the same jurisdiction as other officers in the State, until others should be elected under the Constitution, at the regular election; and that the County Court of said county, at its first session, should elect the county officers which they were entitled to elect. The Act also created certain Commissioners, by name, to purchase land, and locate the seat of justice in said county. The County Court, in pursuance of the Act, met the first Monday in January, 1858 — elected a Chairman and a Quoram Court, a Sheriff, County Court Clerk, Coroner, Surveyor, Ranger, Entry Taker, Register, and Tax Collector — laid off civil districts, and designated the places of voting — established public roads, with overseers — laid off school districts, fixed the rate of taxes, appointed Revenue Commissioners, and Commissioners to lay off the town at the county seat, and to superintend the erection of public buildings — chartered bridges, and appointed guardians, &c. The Commissioners appointed by the General Assembly located the county seat, purchased a tract of land whereon to erect a town, took the title bond of the vendor, and assigned the same to the Commissioners appointed by the County *263 Court to lay off the town and public buildings, &c.; and in all respects, discharged their functions, and ceased to have anything further to do as early as February the 3d, 1858 — some days, as we have seen, prior to the filing of the bill.
Now, it seems to us, that upon the authority of Ford vs. Forwer et als., this was a complete organization of tbe county; and that Bridgenor, by not presenting himself at an earlier day, lost the right to call in question the validity of this Act. We may remark, too, that the county of Sequatchie was, by the General Assembly of Tennessee, in various Statutes passed subsequent to the 3rd of February, 1858, recognized as an organized and valid county.
But, as to the county of Bledsoe, in its corporate character, the question is a very different one. If her original territory has been reduced below its constitutional limits, of six hundred and twenty-five square miles, or her qualified voters have been reduced below one thousand, by either, or both, of the above statements, she is entitled to have the same restored to her by a decree in this cause; and this is so, whether the county of Sequatchie be fully organized or not. As to this, all the authorities are agreed: 9 Hum., 152-585; 1 Swan, 236. And the indirection resorted to, in first annexing the tenth civil district of Bledsoe county to the county of Hamilton, and then in converting said district into the new county of Sequatchie, can make no difference. Any violation of the constitutional rights of Bledsoe county, on the part of the Legislature, either in the establishment of a new county, or in taking from her a part of her territory and inhabitors, and attaching them to *264 another, or in changing her lines, are alike to be disregarded, and she restored to her constitutional rights: Gotcher et als. vs. Burrows et als., 9 Hum., 585. But in so restoring Bledsoe county, it is no part of our business, upon this record, to inquire whether the county of Sequatchie has the requisite territory, or population, under the Constitution, to enable her to be a county, or not; nor are we required to ascertain whether the constitutional rights of either Marion or Hamilton counties have been invaded. They do not complain of any such infractions, and it does not lie in the mouth of Bledsoe county to do so, or to ask that the county of Sequatchie be vacated. All that she can demand, is to be restored to her constitutional limits and rights, and if the county of Sequatchie can stand after this is done, it is no concern of hers; and in going beyond this, we hold the Chancellor erred: Maury County vs. Lewis County, 1 Swan, 236-241.
We think he also erred in decreeing, upon the proof in this record, that the constitutional rights of Bledsoe county had been violated. We have carefully read this proof, and it certainly does render it highly probable that the territory of Bledsoe county has, by means of the legislation aforesaid, been reduced below six hundred and twenty-five square miles, and her qualified voters below one thousand; but none of the witnesses can pretend to perfect accuracy. Their estimates are not based upon a survey of the county. Nor is it assumed that the qualified voters have been numbered.
The attempt to abate, or vacate, a new county, or reduce its territory, upon the ground that it has taken to itself portions of another county, with its voters, to *265 which it was not entitled, is of too much importance, and involves too many interests, to be disposed of upon doubtful or uncertain proof. Before this is done, the county of Bledsoe must be accurately surveyed, and its voters numbered. This will furnish reliable evidence upon which to base a claim. The survey and enumeration will, of course, be so made as to ascertain whether any part of what was the tenth civil district of Bledsoe county, be necessary to secure to her the requisite constitutional territory and voters. If so, what part? or will it take the entire district? and a decree will be made accordingly.
The decree of the Chancellor will be reversed, and the cause remanded for this purpose.